IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Alan S.,[1] | ) | C/A No.: 1:21-320-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[2] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable R. Bryan Harwell, United States District Judge, dated February 8, 2021, referring this matter for disposition. [ECF No. 9]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Andrew Saul as the defendant in this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On September 4, 2019 Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began July 31, 2019. Tr. at 77, 106, 169–71, 172–74. His applications were denied initially and upon reconsideration. Tr. at 110–13, 119–20, 121–22. On October 22, 2020, Plaintiff had a telephonic hearing before Administrative Law Judge ("ALJ") Amanda Craven. Tr. at 37–60 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 6, 2020, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 7–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 2, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 45 years old at the time of the hearing. Tr. at 43. He completed high school. *Id.* His past relevant work ("PRW") was as a janitor, a stock clerk, and a delivery truck driver. Tr. at 54–55. He alleges he has been unable to work since July 31, 2019. Tr. at 169.

2.    Medical History

On January 28, 2019, Plaintiff presented to the emergency room ("ER") at Self Regional Healthcare with complaints of a two-day history of chest pain, headache, abdominal pain, nausea, and vomiting. Tr. at 324. Cardiac enzyme testing revealed abnormalities. *Id.* Cardiologist Paul E. Kim, M.D. ("Dr. Kim"), admitted Plaintiff for non-ST segment elevation myocardial infarction ("non-STEMI") and scheduled him for cardiac catheterization. *Id.* The cardiac catheterization revealed total occlusion of the circumflex proximally, which Dr. Kim stented with a 3.0 x 28 mm Xience Sierra stent. Tr. at 329. Plaintiff had a 30% stenosis in the proximal left anterior descending artery, a 50% ostial stenosis in a small proximal, first obtuse marginal branch, and a 30% stenosis in the proximal right coronary artery. *Id.* He was discharged on January 29, 2019, with diagnoses of non-STEMI of the posterior wall, coronary artery disease ("CAD") involving native vessels, dyslipidemia, and hypertension. *Id.*

Plaintiff presented to nurse practitioner Rachel Leigh Case ("NP Case") for cardiology follow up on February 6, 2019. Tr. at 374. He described sporadic chest pain similar to, but less severe than he experienced prior to his hospitalization. *Id.* He denied dyspnea, diaphoresis, and nausea. *Id.* He noted his mobility had recently been limited due to foot and calf pain. *Id.* Plaintiff's blood pressure was elevated at 120/96 mmHg. Tr. at 376. NP Case noted psoriasis patches on Plaintiff's legs, but no other abnormalities. *Id.* She ordered an aggressive thyroid panel and Amlodipine 2.5 mg once a day. Tr. at 377. She referred Plaintiff to cardiac rehabilitation and authorized him to remain out of work until after a follow-up visit with Dr. Kim on March 6, 2019. *Id.* She noted the following day that Plaintiff's thyroid-stimulating hormone ("TSH") level was high and that he would need to resume use of Levothyroxine. Tr. at 426.

Plaintiff followed up with nurse practitioner Georges Godfrin ("NP Godfrin") at Good Shepherd Free Medical Clinic on February 7, 2019. Tr. at 369. NP Godfrin noted Plaintiff's abdomen was mildly protuberant, but indicated otherwise normal findings on exam. *Id.* He instructed Plaintiff to continue the medications his cardiologist had prescribed for CAD, Amlodipine and Lopressor for hypertension, and Plavix and acetyl salicylic acid for intermittent claudication. Tr. at 370. He instructed Plaintiff to follow up with cardiology as recommended and to let him know if he required a referral. *Id.*

4

He stated Plaintiff should return to work based on Dr. Kim's recommendation. *Id.*

Plaintiff followed up with Dr. Kim on March 6, 2019. Tr. at 382. He reported shortness of breath upon walking long distances and occasional sharp, fleeting chest pain that improved upon switching positions or moving his thorax. *Id.* Dr. Kim noted Plaintiff appeared to have some chronotropic incompetence that might be exacerbated by Metoprolol therapy. *Id.* He discontinued Metoprolol and instructed Plaintiff to follow up in two weeks. *Id.*

Plaintiff complained of extreme shortness of breath on exertion on March 25, 2019. Tr. at 387. He also endorsed non-exertional left-sided chest discomfort and labile blood pressure that went up and down without explanation. *Id.* Dr. Kim ordered an aortic ultrasound, as Plaintiff was thin, had a palpable pulse in his abdomen, and his father had developed an abdominal aortic aneurysm. *Id.* He also ordered 24-hour ambulatory blood pressure monitoring. *Id.* Plaintiff's blood pressure was elevated at 142/97 mmHg. Tr. at 389. Dr. Kim noted Plaintiff was "struggling" and held Atorvastatin until a follow-up visit. Tr. at 390.

On April 24, 2019, Dr. Kim noted the aortic ultrasound was normal, but that Plaintiff had not undergone the ambulatory blood pressure monitoring. Tr. at 394. Plaintiff reported shortness of breath in combination with

elevated blood pressure. *Id.* His blood pressure was elevated at 149/86 mmHg. Tr. at 403. Dr. Kim prescribed Lisinopril 5 mg and indicated he might increase it to 10 mg. Tr. at 397. He noted: "Patient doing well. It has taken him a while for him to feel up to going back to work but he should go back to work next week." *Id.*

On May 9, 2019, Plaintiff sent a message to NP Case indicating he was struggling with pain in his feet and legs after walking around for about two hours. Tr. at 417. He noted shortness of breath caused him to "give out really quickly." *Id.* He said he had left work early a few times and was unable to meet his employer's expectations. *Id.* NP Case responded that she did not have an indication from a cardiac standpoint to keep Plaintiff out of work. Tr. at 418.

On May 16, 2019, Plaintiff reported pain in his legs and feet with ambulation, but denied chest pain and shortness of breath. Tr. at 410. The provider ordered ankle brachial index ("ABI") studies. *Id.* The ABI studies were normal. Tr. at 411.

Plaintiff presented to the emergency room ("ER") at Laurens County Hospital with chest pain on June 1, 2019. Tr. at 414. He described left arm discomfort and tingling and feeling jittery. *Id.* He admitted to taking Benadryl, Goody powder, and several doses of Afrin. *Id.* Jittin Thakor Muljibhai, M.D. ("Dr. Muljibhai"), observed Plaintiff to appear anxious. *Id.*

Plaintiff's blood pressure was elevated at 151/99 mmHg. Tr. at 416. An electrocardiogram ("EKG") was normal. *Id.* Dr. Muljibhai noted Plaintiff's symptoms were likely caused by a combination of caffeine products, nasal decongestant, and Benadryl. *Id.*

Plaintiff presented to the ER at Self Regional Healthcare on October 12, 2019. Tr. at 467. He complained of acute onset dyspnea and a tender chest mass and noted his symptoms had not resolved with sublingual nitroglycerin. *Id.* He described an incident the prior week in which he had sudden onset of dyspnea and palpitations that resolved after about 25 minutes of rest. *Id.* He also reported he had noticed a left lower extremity mass that had recently moved. *Id.* Physician assistant Gary Dallas Morrison, II, discharged Plaintiff after lab studies revealed no acute signs of coronary syndrome and D-dimer was negative for pulmonary embolism. Tr. at 469.

Plaintiff presented to Kenneth David Kiser, M.D. ("Dr. Kiser"), on November 21, 2019, to establish treatment. Tr. at 508. He reported mild intermittent asthma with acute exacerbation, acquired hypothyroidism, essential hypertension, CAD involving the native coronary artery of the native heart with angina pectoris, panic disorder, dyspnea on exertion, hypercholesterolemia, and need for immunization against influenza. *Id.* He endorsed a history of anxiety, panic, and intermittent depression with associated fatigue and decreased appetite and focus. *Id.* He noted prior

treatment with Paxil had caused seizures. *Id.* He indicated he exercised by walking about 20 minutes three days a week. *Id.* He reported tinnitus and indicated he had sustained a fall the prior Tuesday. *Id.* He endorsed fatigue, sinus pressure, chest tightness, shortness of breath, palpitations, cold intolerance, neck pain and stiffness, dizziness, hand and leg tremors, speech difficulty, leg weakness, lightheadedness, headaches, confusion, and nervousness/anxiety. Tr. at 511. Dr. Kiser observed diminished peak expiratory flow of 220, with 520 being normal for age and height. *Id.* He administered Albuterol nebulization, which helped Plaintiff's peak expiratory flow to increase to 320. *Id.* He assessed mild intermittent asthma with acute exacerbation, acquired hypothyroidism, and essential hypertension. *Id.* He instructed Plaintiff to take Lisinopril 5 mg daily, avoid salty foods, be compliant with his other medications, and exercise for 150 minutes per week. *Id.* He ordered lab studies, prescribed Zoloft 25 mg daily for panic disorder, and instructed Plaintiff to discontinue caffeine. Tr. at 512. Dr. Kiser's staff followed up with Plaintiff on November 25, 2019, to inform him that his thyroid tests, sodium, potassium, glucose, blood count, and kidney function were normal and his cholesterol was great. Tr. at 507.

On November 26, 2019, state agency psychological consultant Xanthia Harkness, Ph.D. ("Dr. Harkness"), reviewed the record and considered Listing 12.06 for anxiety and obsessive-compulsive disorders. Tr. at 73. She

assessed Plaintiff as having no limitation in his ability to adapt or manage oneself and mild limitations in his abilities to understand, remember, or apply information, interact with others, and concentrate, persist, or maintain pace. Tr. at 73–74, 83–84. She concluded Plaintiff's mental impairment was not severe. *Id.* A second state agency psychological consultant, Larry Clanton, Ph.D. ("Dr. Clanton"), reviewed the evidence on February 27, 2020, and affirmed Dr. Harkness's assessment. *Compare* Tr. at 73–74 and 83–84, *with* Tr. at 93–95, 102–04.

Plaintiff followed up with Dr. Kiser on December 20, 2019. Tr. at 550. Dr. Kiser recorded normal findings on physical exam. *Id.* He assessed panic disorder with agoraphobia and moderate panic attacks and essential hypertension. *Id.* He referred Plaintiff to cardiac rehabilitation. Tr. at 551. He increased Zoloft to 50 mg and instructed Plaintiff to discontinue caffeine and sugar. *Id.*

Plaintiff returned to Dr. Kiser for evaluation of hypertension, hyperlipidemia, depression, panic disorder, hypothyroidism, and CAD on January 15, 2020. Tr. at 560. He reported he was waiting for his insurance provider to approve cardiac rehabilitation. *Id.* He endorsed fatigue and noted not sleeping well. *Id.* He indicated he had experienced chest pain over the holidays requiring nitroglycerin. Tr. at 561. He described the pain as radiating into his arm and hand, but admitted it might have been a panic

attack. *Id.* He endorsed some shortness of breath, left leg muscle soreness, and confusion. *Id.* Dr. Kiser recorded normal findings on physical exam. Tr. at 566–67.

On February 13, 2020, Plaintiff complained of neck pain, CAD, hypertension, hypothyroidism, anxiety, depression, and panic attacks. Tr. at 578. He reported some heart palpitations at night and with dizziness. Tr. at 579. His blood pressure was elevated at 128/97 mmHg. Tr. at 584. Dr. Kiser recorded normal findings on physical exam. Tr. at 584–85. He prescribed nitroglycerin and referred Plaintiff to a cardiologist. Tr. at 585.

Plaintiff presented to Jack E. Dobkin, D.O. ("Dr. Dobkin"), for a cardiology consultation on February 20, 2020. Tr. at 590. He described exertional chest discomfort that had recurred a few months after stent placement and dyspnea and pressure-like mid-sternal chest pain with more than mild activity. Tr. at 591. He noted his heart would sporadically skip beats. *Id.* He endorsed chronic anxiety and a history of panic attacks. *Id.* Dr. Dobkin recorded normal findings on physical exam. Tr. at 595. An EKG was normal. Tr. at 596. Dr. Dobkin assessed CAD with percutaneous coronary intervention ("PCI") in January 2019 after non-STEMI, exertional chest pain suspicious of chronic stable angina, hypertension, and anxiety/panic attacks. Tr. at 590. He noted Plaintiff's symptoms appeared to have recurred within the time frame of possible stent restenosis. *Id.* However, he noted Plaintiff

had "a lot of anxiety overlay which may cloud the picture some." *Id.* He ordered a diagnostic catheterization. *Id.*

On March 19, 2020, Plaintiff reported he had experienced daily chest pain since his heart attack. Tr. at 600. He reported being compliant with his medication and that his panic attacks had improved. Tr. at 601. He indicated experiencing feelings of pressure, tightness, or pain in his chest area, neck, or shoulder with exertion. *Id.* He endorsed recent use of nitroglycerin and worsened dyspnea with rest or activity. *Id.* Dr. Kiser recorded normal findings on physical exam. Tr. at 607. He increased Plaintiff's Zoloft dose from 50 to 100 mg due to a positive depression screen and instructed him to exercise and avoid caffeine. Tr. at 606.

Plaintiff returned to Dr. Kiser on March 30, 2020. Tr. at 613. He complained of constant, dull chest pain in his left sternal border and panic disorder. *Id.* He endorsed feelings of pressure, tightness, or pain in his chest area, neck, or shoulder with exertion and longer-lasting dyspnea. Tr. at 614. He also described muscle soreness and edema in his left leg. *Id.* Dr. Kiser recorded normal findings on physical exam. Tr. at 618–19.

Plaintiff had a telemedicine visit with Dr. Kiser on May 1, 2020. Tr. at 626. He complained of gastroesophageal reflux disease ("GERD"), hypothyroidism, chronic rhinitis, CAD, hypertension, panic disorder, anxiety, and depression. *Id.* Dr. Kiser noted Plaintiff was very apprehensive and

anxious about appearing in court for his disability claim. *Id.* He indicated Plaintiff's depression was controlled. *Id.* Plaintiff endorsed the following: being easily distracted; having difficulty reading or listening to others; struggling to complete tasks; easily overlooking details, creating errors and incomplete work; having a hard time remembering conversations and following directions; becoming so absorbed in a task that he would lose track of time and other responsibilities; having an extremely messy or cluttered home, office, desk, or car; trouble starting and finishing projects; sometimes forgetting appointments, commitments, and deadlines; constantly losing or misplacing things; underestimating the time it would take to complete tasks; frequently interrupting others or talking over them; being easily flustered and stressed out; trouble with irritability or mood swings; and experiencing low self-esteem and a sense of insecurity. *Id.* He indicated he experienced feelings of pressure, tightness, or pain in his chest area, neck, or shoulder with exertion. Tr. at 627. He reported worsened shortness of breath, requiring nitroglycerin any time he exerted himself, decreased exercise tolerance, muscle soreness in his lower left leg, and edema in his legs. *Id.* He endorsed panic attacks and increased anxiety over the prior few weeks. Tr. at 633.

On June 11, 2020, Plaintiff reported intermittent left calf pain and indicated he was using a bicycle to exercise. Tr. at 639. He indicated

symptoms of depression and anxiety had worsened since the prior visit. *Id.* He stated Zoloft helped a little bit. *Id.* He reported isolating himself from others and experiencing nervousness, jitteriness, difficulty breathing, shortness of breath, difficulty sleeping, and some feelings of worthlessness. *Id.* He described chest tightness and shortness of breath due to anxiety, decreased concentration, dysphoric mood, and sleep disturbance. Tr. at 644. Dr. Kiser indicated Plaintiff was "nervous/anxious" and had tenderness at the fifth costochondral junction on the left with palpation reproducing chest pain. Tr. at 644–45.

On September 9, 2020, Dr. Kiser noted Plaintiff was "very anxious with depression" that remained the same. Tr. at 652. Plaintiff complained of sharp, stabbing chest pain left of the sternal border and inferior ribs in his left posterior back. *Id.* He indicated he developed chest pain and shortness of breath with activity and required nitroglycerin at least once a week. Tr. at 653. He reported worsened symptoms due to anxiety, staying alone, not being able to do his job due to anxiety attacks, receiving help from his wife to perform responsibilities at home, worrying a lot, having many anxiety attacks, avoiding social activities, and desiring not to be around a lot of people. Tr. at 653. He endorsed increased appetite, fatigue, decreased concentration, dysphoric mood, and nervousness/anxiousness. Tr. at 656. Dr. Kiser noted left breast tenderness and cellulitis in Plaintiff's left lower

extremity. Tr. at 657–58. Plaintiff reported Zoloft 100 mg had provided some help, but he continued to feel bad about being unable to work and having lost his last job due to panic attacks. Tr. at 661.

      C.     The Administrative Proceedings

          1.     The Administrative Hearing

              a.     Plaintiff's Testimony

At the hearing on October 22, 2020, Plaintiff testified he lived with his wife and three daughters, ages 13, 17, and 21. Tr. at 43. He denied having worked since July 2019. *Id.* He indicated he received a two-week severance from Lowe's during the third quarter of 2019. Tr. at 43–44. He confirmed subsequently receiving unemployment benefits. Tr. at 44.

Plaintiff testified he had worked as a janitor for Lowe's. *Id.* He estimated he lifted 10 to 15 pounds when performing janitorial duties and 60 to 75 pounds when performing maintenance. *Id.* He stated he had previously worked full-time for Ware Shoals School District in custodial maintenance and had lifting requirements like those at Lowe's. *Id.* He explained he previously worked as a tire lube technician for Walmart and had stocking duties on third shift. *Id.* He indicated he worked alone in the position and that his job duties did not include car maintenance. Tr. at 45. He said he would lift batteries and tires weighing 50 to 60 pounds. *Id.* Plaintiff noted previously working as a delivery clerk for Self Regional, loading and

unloading trucks and delivering basic hospital supplies. *Id.* He estimated he lifted more than 50 pounds while performing the job. *Id.*

Plaintiff testified he stopped working at Lowe's in July 2019 because of difficulty after having a heart attack earlier in the year. Tr. at 46–47. He said he had been diagnosed with CAD, angina, and hypertension. Tr. at 47. He described daily chest pain and pressure lasting for two hours or more and requiring he lie down and take Nitroglycerin. *Id.* He confirmed having had a heart attack on January 28, 2019, and subsequently undergoing placement of a stent. *Id.* He admitted he had returned to work after his heart attack, but said he stopped working due to worsening shortness of breath on exertion and angina. *Id.*

Plaintiff confirmed continuing to experience daily chest pain. *Id.* He said would take nitroglycerin and lie down at least three to four times per week. Tr. at 48. He described sharp chest pain that took his breath away. *Id.* He said he experienced shortness of breath with minimal activities like putting on his shoes or socks and combing his hair. *Id.* He indicated he often spoke softly because talking loudly required greater effort and sometimes caused him shortness of breath. Tr. at 49.

Plaintiff stated he used two inhalers to help him breathe. *Id.* He indicated he used a rescue inhaler at least three or four times a day. *Id.* He said his heart problems caused him to have no energy and feel constantly

fatigued. *Id.* He noted his chest pain sometimes triggered panic attacks. *Id.* He described short panic attacks that occurred three or four times a day. *Id.* He said his panic attacks required he lie down in a dark room and try to relax. Tr. at 50.

Plaintiff testified he experienced side effects of medication including tension headaches, nausea, dizziness, and difficulty sleeping. *Id.* He indicated he had agoraphobia and experienced panic when he was around a lot of people at once. Tr. at 51. He said he had worked third shift or after normal hours on his prior jobs so he would not have to be around a lot of people. *Id.*

Plaintiff stated he had to stand up after sitting for about 20 minutes, as his feet and legs would go to sleep. *Id.* He said he could likely stand about five minutes and walk about five minutes, but no longer, due to shortness of breath on exertion. *Id.* He estimated he could lift and carry one to three pounds. *Id.*

Plaintiff testified he had dealt with symptoms of attention deficit disorder throughout his life, but had increased difficulty focusing due to fears about chest pressure and panic attacks. *Id.* He said he had not been diagnosed with high blood pressure prior to his heart attack. Tr. at 53.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Carey Washington, Ph.D., reviewed the record and testified at the hearing. Tr. at 53–58. The VE categorized

Plaintiff's PRW as a janitor, *Dictionary of Occupational Titles* ("*DOT*") No. 381.687-014, requiring heavy exertion and a specific vocational preparation ("SVP") of 2; a stock clerk, *DOT* No. 299.367-014, requiring heavy exertion and an SVP of 4; and a delivery truck driver, *DOT* No. 906.683-022, requiring medium exertion and an SVP of 3. Tr. at 54–55. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to light work, lifting 20 pounds occasionally and 10 pounds frequently and sitting, standing, and walking for six of eight hours each day; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; no more than occasionally being exposed to excessive heat, moisture, and pulmonary irritants, such as odors, fumes, dust, gases, and poor ventilation; never being exposed to hazards, such as unprotected heights and moving machinery; and limited to simple, routine tasks with a reasoning level of two or less, performed in two-hour blocks of time with no public contact in the workplace. Tr. at 55. The VE testified the hypothetical individual would be unable to perform any of Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as a weigher, *DOT* No. 222.387-074, a sorter, *DOT* No. 361.687-014, and a folder, DOT No. 583.685-042, with approximately

125,000, 125,000 and 100,000 positions available nationally, respectively. Tr. at 55–56.

The ALJ provided a second hypothetical that modified the first hypothetical to reduce the exertional level to sedentary, requiring the individual lift 10 pounds occasionally, less than 10 pounds frequently, sit for six of eight hours, and stand and walk for a combination of two hours. Tr. at 56. The VE testified the person could perform sedentary work as a table worker, *DOT* No. 739.687-182, an inspector, *DOT* No. 669.687-014, and an assembler, *DOT* No. 734.687-018, with 100,000, 125,000, and 125,000 positions available nationally, respectively. Tr. at 56–57.

For a third hypothetical question, the ALJ asked the VE to consider the restrictions in the prior hypothetical questions and to further assume the individual would be off task for 15 percent of the workday, in addition to regular breaks, or would miss two or more days per month. Tr. at 57. She asked the VE to indicate the effects of the additional restrictions on the available jobs. *Id.* The VE stated the additional restrictions would preclude the jobs he had identified, as well as any other substantial work. *Id.* The VE confirmed his testimony had been consistent with the *DOT*, except that the *DOT* did not address time off task and days off task. *Id.* He stated his testimony as to those matters was based on his experience, background, and years assessing individuals and placing them into work. *Id.*

In response to questioning by Plaintiff's attorney, the VE confirmed that any one of the restrictions indicated in the third hypothetical question would preclude work. Tr. at 58.

2.    The ALJ's Findings

In her decision dated November 6, 2020, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.
2.    The claimant has not engaged in substantial gainful activity since July 31, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: coronary artery disease status post stenting; asthma; depressive disorder; and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps or stairs, but never climb ladders/ropes/scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, or crawl. He should have no more than occasional exposure to excessive heat or moisture. He can have no more than occasional exposure to pulmonary irritants, such as odors, fumes, dust, gases, or poor ventilation. He can have no exposure to hazards, such as unprotected heights and moving machinery. He can perform simple, routine tasks with a reasoning level of 2 or less, performed in 2 hour blocks of time, with no public contact in the work place.
6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 15, 1975 and was 43 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 31, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 12–21.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ did not adequately account for Plaintiff's moderate limitations in interacting with others and maintaining concentration, persistence, or pace;

2)  the ALJ's reasons for discounting the treating physician's opinion were not supported by substantial evidence; and

3)  the ALJ's decision is constitutionally-defective.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982).

---

C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*,

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Moderate Limitations in Interacting with Others and Maintaining Concentration, Persistence, or Pace

Plaintiff argues the ALJ failed to adequately account in the RFC assessment for his moderate limitations in interacting with others and maintaining concentration, persistence, or pace. [ECF No. 16 at 14]. He maintains the ALJ neither imposed limitations on his interaction with coworkers and supervisors, nor explained her reasons for declining to do so. *Id.* at 14–17; ECF No. 18 at 7. He contends the ALJ failed to explain how limiting him to simple, routine tasks with a reasoning level of two or less over two-hour blocks of time accounted for his deficit in concentrating, persisting, or maintaining pace. *Id.* at 17–21; ECF No. 18 at 8. He claims the ALJ failed to address his ability to stay on task throughout a workday. *Id.* at 18–19. He maintains the ALJ's failure to include all his limitations in the RFC assessment was harmful. *Id.* at 21–22.

The Commissioner argues the ALJ's RFC assessment fully comports with the regulations and Fourth Circuit case law. [ECF No. 17 at 19]. Citing *Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020), she maintains "there is no 'categorical rule' about the specific limitations required for a claimant with a 'moderate' rating. *Id.* She contends the ALJ provided adequate reasoning to support the RFC assessment and her decision allows for meaningful review.

*Id.* at 21–23. She notes the ALJ included multiple restrictions related to Plaintiff's mental health in the RFC assessment. *Id.*

ALJs must use the special technique in 20 C.F.R. § 404.1520a and § 416.920a to evaluate cases involving mental impairments. After the ALJ concludes the claimant has a medically-determinable mental impairment, she is required to rate the degree of the claimant's functional limitation as none, mild, moderate, marked, or extreme based on "the extent to which [his] impairment(s) interfere with [his] ability to function independently, appropriately, effectively, and on a sustained basis" in the broad functional areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself." 20 C.F.R. §§ 404.1520a(b), (c)(2), (3), (4), 416.920a(b), (c)(2), (3), (4). Should the ALJ conclude the claimant's mental impairments do not meet or are not equivalent in severity to any listed mental disorders, she is to consider the impairments in assessing the claimant's RFC. 20 C.F.R. §§ 404.1520a(d), 416.920a(d)

The claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To properly assess the claimant's RFC, the ALJ must "consider all of the claimant's 'physical and mental limitations, severe and otherwise, and determine on a function-by-function basis, how they affect [his] ability to work.'" *Thomas v. Berryhill*,

916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)). The RFC assessment should reflect consideration of all the relevant evidence and the ALJ should address all the claimant's medically-determinable impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must include a narrative discussion citing "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explaining how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. She "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

### a.    Interacting with Others

To evaluate a claimant's ability to interact with others, the ALJ must consider the claimant's "abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(2). Examples of this area of functioning include: "cooperating with others; stating own point of view; initiating or sustaining conversation;

understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id.* Although these examples "illustrate the nature of this area of mental functioning," ALJs are not required to document consideration of all the examples. *Id.*

The ALJ used the special technique in 20 C.F.R. § 404.1520a and § 416.920a in assessing Plaintiff's mental impairments. She assessed a moderate limitation in interacting with others based on Plaintiff's "complaints of agoraphobia with difficulties dealing with crowds," as well as his indications that he could "drive a car, go out alone, and go grocery shopping." Tr. at 15. She further noted: "He talks with family on a daily basis and he indicated that his conditions do not affect his ability to get along with others (Exhibit 9E)." *Id.*

The ALJ included a provision in the RFC assessment for "no public contact in the work place," to address the moderate limitation she assessed in interacting with others. Tr. at 18. She noted Plaintiff "report[ed] symptoms of agoraphobia with decreased social interaction and difficulties being in crowds." Tr. at 18. She declined to find additional mental functional limitations, explaining as follows:

> Despite the claimant's allegations, the longitudinal objective findings do not support a more restrictive residual functional

capacity. For instance, hospital records from January of 2019 revealed the claimant's mood and affect to be normal (Exhibit 1F). Follow-up cardiology records from February of 2019 revealed similar findings (Exhibit 3F). On April 24, 2019, the claimant's mood, affect, and behavior were noted to be normal (Exhibit 4F). On June 1, 2019, records note that the claimant's mood and affect were normal (Exhibit 6F). On October 12, 2019, the claimant's mood, affect and behavior were noted to be normal. He was not anxious (Exhibit 7F). On November 21, 2019, the claimant was noted to have a normal mood, affect, behavior, judgment and thought content (Exhibit 9F). On December 20, 2019, the claimant was noted to have panic attacks; however, they have decreased in severity and frequency. The claimant also reported ongoing depression. However, an examination revealed that the claimant had a normal mood, affect, behavior, judgment and thought content. Similar findings were noted on January 15, 2020 (Exhibit 11F). On February 13, 2020, primary care physician Dr. Kiser noted that the claimant's depression and anxiety is controlled (Exhibit 14F). Cardiology records from February of 2020 note a negative symptom review for depression. The claimant did not appear nervous or anxious and his mood and affect were noted to be normal (Exhibit 14F). On March 19, 2020, the claimant was noted to have continued depression but his panic attacks have improved. Dr. Kiser noted that the claimant exhibited a normal mood, affect and judgment (Exhibit 14F). On May 1, 2020, Dr. Kiser noted that the claimant's depression is controlled (Exhibit 14F). Records through September of 2020 note similar unremarkable psychiatric examinations (Exhibit 14F).

Tr. at 18.

Although the ALJ cited multiple treatment notes that supported her conclusion, she failed to address contrary evidence. Her evaluation of Plaintiff's ability to interact with others reflects impermissible cherrypicking of the record. *See Lewis v. Berryhill*, 858 F.3d 858, 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply

cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.") (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)).

Plaintiff's testimony suggested he had difficulty interacting socially such that he had worked in prior jobs where he was permitted to work alone. He noted the following in discussing his prior work at Walmart: "Because I don't get along with people, I have a kind of like agoraphobia type of deal. I worked third shift. That way I was pretty much by myself and stocked the shop area." Tr. at 45. He later testified: "Well, I mean I was kind of diagnosed with agoraphobia. In other words, I have a panic issue if I'm around a lot of people at one time. So I worked third shift starting there because there's not any people around." Tr. at 51. He stated he worked "[t]hird shift maintenance janitorial" where there was "no one around." *Id.* He said he worked in the school "after hours," when there were no students around. *Id.* He confirmed that all his jobs over the prior 15 years had been after-hours, third shift-type jobs that did not "involve people." *Id.*

Additional evidence from Plaintiff's treatment visits arguably supports restrictions to his RFC as to interaction with coworkers and supervisors. Upon presenting to Dr. Kiser on November 21, 2019, Plaintiff reported a history of anxiety, panic, and intermittent depression that prompted Dr. Kiser to prescribe Zoloft 25 mg. Tr. at 508, 512. Dr. Kiser increased Zoloft to

50 mg on December 20, 2019, to address panic attacks. Tr. at 551. On March 19, 2020, Dr. Kiser again increased Zoloft from 50 to 100 mg due to increased symptoms. Tr. at 606. On May 1, 2020, Dr. Kiser noted Plaintiff was very apprehensive and anxious about appearing in court for his disability claim, and Plaintiff reported difficulty listening to others and frequently interrupting others or talking over them, which were indicative of difficulties with social interaction. Tr. at 626. On June 11, 2020, Plaintiff described isolating himself from others. Tr. at 639, 644. On September 9, 2020, Plaintiff reported staying alone, avoiding social activities, and desiring not to be around a lot of people. Tr. at 653.

A review of the record shows the ALJ failed to assess Plaintiff's capacity to interact with coworkers and supervisors, despite unresolved evidence that suggested he had limited ability to interact with all others. She imposed restriction as to Plaintiff's interaction with the public, but provided no explanation as to how the restriction to public interaction accommodated Plaintiff's impairments and symptoms. Although she cited evidence to support her conclusion that Plaintiff had no additional mental limitations, she failed to reference or reconcile evidence to the contrary. The ALJ's failure to address and explain inconsistencies between the evidence she cited in her decision and those cited by Plaintiff and acknowledged above by the court render her assessment of Plaintiff's ability to interact with others

unsupported by substantial evidence, as she did not comply with SSR 96-8p

and the Fourth Circuit's direction in *Mascio* in assessing Plaintiff's ability to

perform relevant functions.

> b.      Concentrating, Persisting, or Maintaining Pace

Evaluation of a claimant's ability to concentrate, persist, or maintain

pace requires consideration of his "abilities to focus attention on work

activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P,

App'x 1, § 12.00(E)(3). "[T]he nature of this area of mental functioning"

encompasses the following non-exclusive functions:

> initiating and performing a task that you know how to do;
> working at an appropriate and consistent pace; completing tasks
> in a timely manner; ignoring or avoiding distractions while
> working; changing activities or work settings without being
> disruptive; working close to or with others without interrupting
> or distracting them; sustaining an ordinary routine and regular
> attendance at work; and working a full day without needing more
> than the allotted number or length of rest periods during the day.

*Id.* Although these examples "illustrate the nature of this area of mental

functioning," the ALJ is not required to document his consideration of all the

examples. *Id.*

The Fourth Circuit has "agree[d] with other circuits that an ALJ does

not account for a claimant's limitations in concentration, persistence, and

pace by restricting the hypothetical question to simple, routine tasks or

unskilled work." *Mascio*, 780 F.3d at 638. In *Mascio*, the court considered

remand appropriate based on the record before it "because the ALJ here gave

no explanation." *Id.* However, the court recognized that a restriction to simple, routine tasks or unskilled work could account for significant restrictions to concentration, persistence, or pace if the ALJ provided an appropriate explanation. *See id.*; *see also Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020) (explaining that in *Mascio*, the court "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC," but noting the ALJ must explain how she accounted for the limitation).

The ALJ explained her assessment of moderate limitations in concentrating, persisting, or maintaining pace, as follows:

> I found the claimant to have moderate limitations in this domain due to his subjective complaints of difficulties concentrating (Exhibit 9E). However, records only recently document this complaint and there is a lack of objective findings corroborating his claims, nor is there evidence of significant deficits in concentration, persistence or pace that would support marked limitations in this domain.

Tr. at 15.

Unlike the ALJ in *Mascio*, the ALJ did not simply limit Plaintiff to simple, routine tasks or unskilled work, but included in the RFC assessment provisions for "simple, routine tasks with a reasoning level of 2 or less, performed in 2 hour blocks of time." Tr. at 15. She specified the restrictions addressed Plaintiff's moderate limitation in concentrating, persisting, or maintaining pace. Tr. at 18. She explained that she had declined to include

additional restrictions based on multiple treatment records that documented normal mood, affect, behavior, judgment, and thought content. Tr. at 18.

> The ALJ wrote:

> In terms of the claimant's allege[d] mental impairments with reported symptoms that include decreased concentration and panic attacks, I found the claimant to have moderate limitations in the domains of "understanding, remembering, or applying information" and "concentrating, persisting or maintaining pace." To account for these limitations, I have limited to the claimant to simple, routine tasks with a reasoning level of 2 or less, performed in 2 hour blocks of time.

Tr. at 18. The ALJ's decision fails to elucidate her reasons for imposing the restrictions she included in the RFC assessment, leaving the court to speculate as to why she felt those provisions accommodated Plaintiff's impairments and symptoms.

Like her consideration of Plaintiff's moderate limitation in interacting with others, the ALJ's consideration of Plaintiff's moderate limitation in concentrating, persisting, or maintaining pace and her reasons for declining to include additional restrictions reflect a failure to acknowledge and resolve evidence that conflicted with her conclusion. Plaintiff's medical records arguably suggest that his anxiety and panic-related symptoms would have prevented him from working at an appropriate and consistent pace, completing tasks in a timely manner, sustaining an ordinary routine, maintaining regular attendance, and working a full day without requiring excessive breaks.

As noted above, Dr. Kiser prescribed Zoloft and increased Plaintiff's dosage to address increased symptoms mostly related to anxiety. Tr. at 508, 512, 606. In February 2020, Dr. Dobkin noted Plaintiff had "a lot of anxiety overlay which may cloud the picture some" as to cardiac symptoms. Tr. at 590. In May 2020, Dr. Kiser observed Plaintiff to be very apprehensive and anxious. Tr. at 626. During treatment visits, Plaintiff endorsed decreased focus, being easily distracted, struggling to complete tasks, easily overlooking details creating errors and incomplete work, having difficulty remembering conversations and following directions, losing track of time and other responsibilities while engaged in a task, maintaining messy and unorganized spaces, having difficulty completing tasks he started, forgetting obligations, losing or misplacing things, underestimating the amount of time required to complete tasks, being easily flustered and stressed, having decreased concentration, and having been fired from his last job due to anxiety attacks. Tr. at 508, 626, 644, 653, 656, 661. He reported increased panic attacks during several visits, as well. Tr. at 633, 639, 652. Dr. Kiser opined that Plaintiff's experience of pain was constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks and that he was incapable of performing even low stress jobs. Tr. at 573. He felt that Plaintiff would require unscheduled breaks as needed throughout an

eight-hour workday and would be absent from work more than four days per month because of his impairments or treatment. Tr. at 574, 575.

The ALJ was not required to impose additional restrictions based on this evidence, but she was required to reconcile it with the other evidence in assessing Plaintiff's RFC. She addressed Dr. Kiser's opinion, but ignored the other evidence contrary to her conclusion.

For the foregoing reasons, the ALJ's consideration of Plaintiff's moderate limitation in concentrating, persisting, or maintaining pace is not supported by substantial evidence, as SSR 96-8p and Fourth Circuit precent require an ALJ to assess a claimant's capacity to perform relevant functions, address contradictory evidence in the record, and adequately explain her conclusions.

### 2.    Dr. Kiser's Opinions

On December 20, 2019, Dr. Kiser completed a physician questionnaire at Plaintiff's attorney's request. Tr. at 571–75. He indicated he had contact with Plaintiff on November 21, 2019. Tr. at 572. He identified Plaintiff's diagnoses as hypertension, CAD, panic disorder, dyspnea on exertion, and physical deconditioning. *Id.* He stated Plaintiff's prognosis was good. *Id.* He noted Plaintiff's symptoms included chest pain and panic attacks. *Id.* He stated Plaintiff experienced left anterior chest pain with unknown precipitating factors. *Id.* He indicated Plaintiff had undergone heart

catheterization. *Id.* He identified no side effects of medications that would affect Plaintiff's ability to work. *Id.* He stated Plaintiff's impairments had lasted or were expected to last at least 12 months. *Id.* He felt that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. *Id.* He noted Plaintiff's physical condition was affected by depression, anxiety, and panic attacks. *Id.* He opined that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations he described in the questionnaire. *Id.* He indicated Plaintiff's experience of pain was constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks. Tr. at 573. He considered Plaintiff incapable of performing even low stress jobs. *Id.* He estimated Plaintiff could walk less than one city block without rest or severe pain; sit for 30 minutes at a time; stand for 15 minutes at a time; and sit for about two hours in an eight-hour workday. *Id.* He felt that Plaintiff would need to include periods of walking around during an eight-hour workday and that such periods should occur for a period of 10 minutes out of every 15 minutes. *Id.* He noted Plaintiff would need a job that would permit shifting positions at will from sitting, standing, or walking. Tr. at 574. He felt that Plaintiff would require unscheduled breaks as needed throughout an eight-hour workday. *Id.* He stated Plaintiff could occasionally stoop/bend, rarely crouch/squat and climb stairs, and never climb ladders. *Id.* He estimated

Plaintiff would be absent from work more than four days per month because of his impairments or treatment. Tr. at 575.

On March 30, 2020, Dr. Kiser completed a medical release/physician's statement form from the South Carolina Department of Social Services. Tr. at 569–70. He indicated Plaintiff's disability was permanent and he was unable to work or participate in activities to prepare for work. Tr. at 569. He noted Plaintiff could sit for four hours; stand for two hours; climb stairs/ladders for two hours; kneel/squat for two hours; bend/stoop for two hours; push/pull for two hours; and engage in keyboarding for two hours during a workday. *Id.* He stated Plaintiff could not lift/carry objects weighing more than 10 pounds for more than one hour per day. *Id.* He noted Plaintiff's primary disabling diagnoses were CAD, hypothyroidism, and hypertension and his secondary disabling diagnoses were panic disorder and anxiety. Tr. at 570.

Plaintiff argues the ALJ discounted Dr. Kiser's opinions without adequate explanation. [ECF Nos. 16 at 23 and 18 at 9]. He maintains the ALJ did not indicate how normal mood and affect undermined the mental limitations Dr. Kiser indicated. *Id.* at 24. He contends the cardiologist's finding that his chest pain "had a lot of psychological overlay" was consistent with Dr. Kiser's opinion that his mental symptoms would limit his ability to work. *Id.* at 25. He further maintains the ALJ did not explain how Dr. Kiser's

opinions as to limitations were undermined by observations of normal range of motion and no pulmonary effusion, lower extremity tenderness, or edema. *Id.*

The Commissioner argues the ALJ adequately considered the appropriate regulations and explained her reasons for finding Dr. Kiser's opinions unpersuasive, given a lack of consistency and support in the record. [ECF No. 17 at 27]. She maintains the ALJ explained that Dr. Kiser's notes did not support his opinions and that his opinions were inconsistent with the other evidence, including cardiology and hospital records. *Id.* at 27–28.

The applicable regulations require ALJs to consider the persuasiveness of each medical opinion, given the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1520c(b), (c), 416.920c(b), (c). She is not required to defer to or give any specific evidentiary weight to any medical opinion, including one from a claimant's treating medical source. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ must specify how she considered the supportability and consistency factors in evaluating each medical opinion, as they are considered the most important factors. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2). She is not obligated to explain how she considered the other factors, but may choose to do so. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

In evaluating the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion . . . the more persuasive the medical opinion will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). As for the consistency factor, "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The ALJ found Dr. Kiser's statements to be "less persuasive." Tr. at 19. She explained:

> In finding these assessments less persuasive, I note that they lack support from Dr. Kiser's treatment records and are generally inconsistent with the weight of the objective medical records. For instance, Dr. Kiser noted that depression and anxiety compound upon the claimant's physical impairments; however, hospital and cardiology records regularly indicate the claimant's mood and affect are normal. Dr. Kiser also noted that the claimant's anxiety and depression is controlled with medication. Regarding the claimant's physical impairments and limitations, Dr. Kiser's records regularly reveal normal pulmonary effort and no respiratory distress. No tenderness or edema was appreciated in the lower extremities and examinations reveal normal ranges of motion, no edema, and no tenderness (see Exhibit 11F). Records through September of 2020 note similar unremarkable pulmonary and musculoskeletal examinations (Exhibit 14F). Accordingly, I find a lack of support for the severity of limitations noted in Dr. Kiser's assessments.

*Id.*

The ALJ provided some valid reasons for finding Dr. Kiser's opinions to be "less persuasive." The record is generally consistent with her citations to Dr. Kiser's findings on physical exam, which were mostly unremarkable. However, given the recommendation for remand, the ALJ should reevaluate the persuasiveness of Dr. Kiser's opinion, given her failure to address and resolve some conflicting evidence relevant to the supportability and consistency factors. For example, in finding Dr. Kiser's opinion that depression and anxiety compounded upon Plaintiff's physical impairments to be inconsistent with cardiology and hospital records reflecting normal mood and affect, the ALJ reached a conclusion contrary to her prior acknowledgment that during an October 2019 ER visit, "[i]t was noted that the claimant has a history of anxiety, which may be contributing to his symptoms (Exhibit 7F)." Tr. at 17. She also neglected Dr. Dobkin's impression that Plaintiff had "a lot of anxiety overlay which may cloud the picture some" as to cardiac symptoms. Tr. at 590. Although the ALJ cited one reference in the record to Plaintiff's depression being controlled with medication, she ignored that Dr. Kiser increased Zoloft dosage over the course of treatment and Plaintiff's reports of increased anxiety over time. Tr. at 551, 606, 633, 656.

3.    Constitutional Defect

Plaintiff argues appointment of former Commissioner Andrew Saul ("Saul") pursuant to 42 U.S.C. § 902(a)(3), was unconstitutional as it violated separation of powers. [ECF No. 16 at 10]. Section 902(a)(3) provides as follows:

> The Commissioner shall be appointed for a term of 6 years, except that the initial term of office for Commissioner shall terminate January 19, 2001. In any case in which a successor does not take office at the end of a Commissioner's term of office, such Commissioner may continue in office until the entry upon office of such a successor. A Commissioner appointed to a term of office after the commencement of such a term may serve under such appointment only for the remainder of such term. An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office.

Plaintiff claims the unconstitutional nature of Saul's appointment impacted the decision in his case insomuch as the ALJ and Appeals Council derived their authority from Saul. *Id.* at 10–12; ECF No. 18 at 2–6.

The Commissioner agrees with Plaintiff that the statute violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause, but argues Plaintiff cannot prevail based on this ground because he cannot show it caused him harm. [ECF No. 17 at 7–18].

Although the parties present interesting arguments, the court declines to address the issue at this time, given the recommendation for remand on other grounds.

### III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

October 18, 2021                          Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge